Filed 2/11/16  P. v. Hamilton CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>KENNETH DAVID HAMILTON,<br><br>　　　　Defendant and Appellant. | B263963<br><br>(Los Angeles County<br>Super. Ct. No. PA081211) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed.

　　　　Caneel C. Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　No appearance for Plaintiff and Respondent.

————————————————

Appellant Kenneth David Hamilton appeals from the judgment entered following his convictions by jury on count 1 – conspiracy to defraud another of property of a value exceeding $950, and count 2 – grand theft of personal property of a value exceeding $950. (Pen. Code, §§ 182, subd. (a)(4), 487, subd. (a).) The court sentenced appellant to county jail for three years eight months. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

1. *Pretrial Proceedings.*

After appellant was held to answer at his November 4, 2014 preliminary hearing, the People, on November 10, 2014, filed an information alleging count 1 – conspiracy to defraud another of property, and count 2 – grand theft of personal property. At appellant's November 18, 2014 arraignment, he pled not guilty to the charges. On February 11, 2015, a jury and alternate jurors were sworn.

2. *Evidence Presented at Trial.*

    a. *Trial Testimony.*

Andre Alba, the victim, testified as follows. On July 9, 2014, a man identifying himself as Mr. Anderson from Mega Millions Jackpot Sweepstakes[1] called Alba and said Alba had won $3.5 million and a new Mercedes Benz. Anderson told Alba that to receive the prize, Alba had to tell Anderson by phone the code numbers of four $500 debit cards purchased by Alba. Alba complied. Anderson then told Alba to wire by Western Union $2,500 to a woman outside the state and Alba complied. Anderson then told Alba to send a $2,500 MoneyGram to another person outside the state and Alba complied. The next day, Anderson told Alba by phone that Alba needed to provide an additional $32,000. Alba indicated someone would have to come to his home to collect the money. Alba later believed Sweepstakes was a sham.

On July 12, 2014, Anderson called Alba about the $32,000. Later that day, appellant called Alba about the money. Appellant said he was calling on behalf of

---

[1] This alleged sweepstakes is referred to in the record by various names. Hereafter we generally refer to it as Sweepstakes.

Sweepstakes and for Alba to give the money to appellant so appellant could release the funds to Alba. Alba gave his home address to appellant and called the police. Appellant arrived at Alba's residence and said appellant was a merchant banker and appellant was from Sweepstakes. Appellant was holding a black box that had a combination code. Appellant told Alba that once appellant received the money, a code would be released to Alba by phone so Alba could see if there was a check inside the box. At one point, appellant gave his cell phone to Alba and Alba used it to speak to Anderson.

Los Angeles Police Officer Brian Hernandez testified as follows. On July 12, 2014, Hernandez and Los Angeles Police Officer Raul Olivares went to Alba's home. Appellant, at Alba's doorway, was holding a box with a combination lock. Appellant told Hernandez that appellant was "just there to recover a check for this Mega Millions Sweepstakes winner." Appellant said the check was for $32,000, and also said the box had "the check for the winnings." Appellant told Hernandez something to the effect Anderson was appellant's boss. Appellant denied to Hernandez that appellant had the combination to the lock, but appellant later entered the combination and opened the box; it was empty.[2]

---

[2]     Los Angeles Police Detective Robert Dinlocker testified that, during his July 12, 2014 interview of appellant, appellant told him that "[appellant] was instructed to carry this box and . . . tell [Alba] that there was a check in there." San Bernardino County Detective Lane Thompson testified as follows concerning a prior incident. On June 30, 2011, Thompson interviewed appellant following his arrest for attempting to pass a check obtained through fraudulent means. Appellant told Thompson that appellant met John Anderson on the phone. Anderson was appellant's friend. Appellant told Thompson that Anderson obtained from a payor (Mrs. Wiley) a $50,000 check payable to appellant. Appellant had no explanation as to why a stranger would send him a $50,000 check. Appellant indicated to Thompson that Wiley might have given the money to appellant for his ministry. Appellant denied to Thompson that appellant was a pastor, appellant claimed he worked for a pastor, but appellant declined to provide the pastor's name.

3

b. *Appellant's Recorded Police Interview.*

On July 12, 2014, Detective Dinlocker and Olivares interviewed appellant. During the interview, appellant indicated as follows. Appellant was religious and telling Dinlocker the truth. Appellant "guess[ed]" Anderson obtained appellant's phone number from Grace, a Christian woman.[3] Grace gave appellant's phone number to Anderson without telling appellant. Appellant met Anderson when Anderson called him on the phone. Anderson called appellant, identified himself as Grace's friend, and told appellant that Grace had said appellant had prayed for her many times. Anderson told appellant that Anderson wanted to talk with appellant and receive encouragement.

Appellant also told Dinlocker the following. Appellant had known Anderson for more than a year prior to the interview. More than 50 times, Anderson had appellant go to Western Union or MoneyGram and obtain money wired from a sender to appellant. Appellant was paid for doing so, and on one occasion he was told he would be paid $100. Sometimes the money was not wired to appellant but to his acquaintances. Appellant thought the wired money was for missionary work in Jamaica. Anderson would text appellant to send the money to someone in Jamaica. There was a limit on the amount appellant could send by Western Union or MoneyGram, he told this to Anderson, and Anderson told him to find someone appellant could trust. Appellant "ran . . . that part of the operation" for Anderson.

In about June 2014, appellant found out about Sweepstakes. As far as appellant knew, Anderson was the head of Sweepstakes. Anderson told appellant that Anderson worked for Sweepstakes. However, in response to appellant's questions, Anderson told appellant that Anderson was really a missionary and was a godly man.

---

[3] Dinlocker asked appellant where he knew Grace from, and he replied, "From my phone. I don't know her. . . . we [have] been talking for . . . more than a few months." Grace would ask appellant to pray for her. Appellant did not know how Grace obtained his phone number. He did not know her last name, where she lived, or what church she attended. Appellant had never met Grace personally.

4

During the July 12, 2014 interview, Dinlocker asked appellant how he got involved in "this deal today." Appellant replied Anderson called appellant "two days ago before" and said appellant could make money on Friday. Appellant called Anderson on Friday and Anderson told him to wait until the next day. On the morning of July 12, 2014, Anderson called appellant, told him to go to a person's house and collect money from the person, and said the person would pay appellant. Anderson also told appellant to go to Wal-Mart and buy "another one of those boxes." Anderson told appellant the reason appellant was buying the box was "he is going to send out some money to somebody." At some point, Anderson told appellant there was $32,000 to pick up. Anderson was supposed to text to appellant the name of the person to whom appellant would send the money. Anderson said the money was for missionary work.

Appellant called a person (Alba) and left a message that appellant was from Sweepstakes. Appellant was not from Sweepstakes. However, appellant had not lied to Alba; appellant had "been doing this so long," appellant must have been part of Sweepstakes. Nonetheless, the following later occurred: "[Dinlocker]: Okay. So you lied to this guy. You know that this was a lie, to tell this man that you are from mega Sweepstakes -- [¶] [Appellant]: No -- [¶] [Dinlocker]: Even if Anderson told you to say that, it's a lie. Right? [¶] [Appellant]: Yeah."

Appellant called Alba and told him, "my name is Kenneth Hamilton, I'm a merchant banker from Mega Million Sweepstakes." Dinlocker asked, inter alia, why appellant did not tell Alba that appellant understood Alba did mission work and appellant was coming to get money for Reverend Anderson. Appellant replied, "because as a matter of fact, like I said when I was standing there by the door and I was looking up at the sky and I was saying 'Lord, I don't think I want to take this money.' " The following then occurred: "[Dinlocker]: Oh. So did we lie to this guy today? [¶] [Appellant]: Yeah. [¶] [Dinlocker]: We lied to him? [¶] [Appellant]: Yeah. About being a merchant --" Appellant did not know what a merchant banker was; Anderson told appellant what one was.

5

After appellant went to Alba's house, Alba, speaking with Anderson on the phone, asked Anderson what was in the box, whether Alba's money was in the box, and whether the money was a check. Alba asked Anderson why Anderson did not give Alba the combination to the box and let Alba look inside. When Alba said this, appellant was saying Alba was right.

The following then occurred: "[Dinlocker]: Okay you're telling me he's right. You know what I'm thinking? That you know that this is total fucking bullshit. [¶] [Appellant]: Yeah. [¶] [Dinlocker]: Alright, and this poor guy -- you're trying to make your little 100 dollars, and this poor guy is getting ready to get screwed out of 32,000. And he asks the right questions. He wants to see what's in this box. And you know he's right. [¶] [Appellant]: Exactly. [¶] [Dinlocker]: Cause you know this is a scam. [¶] [Appellant]: Exactly. [¶] [Dinlocker]: You know there isn't shit in that box. [¶] [Appellant]: Exactly. [¶] [Dinlocker]: Cause you bought the box. [¶] [Appellant]: Exactly, that's why I'm saying to myself standing there -- and I said 'I'm not taking this money. As a matter of fact, I'm going to take this box and I'm going walk away' and I took the box and walk away, and I turn around and look and I see a police car pull up . . . ." Appellant was being used as part of a scam, and he was "like the mule, doing all the legwork." According to appellant, Alba was lying when Alba told Dinlocker that appellant had said to Alba, "your check is in here and when you pay me the money, Mr. Anderson is going to give you the combination."

At some point at the scene, Alba accused appellant of stealing Alba's money and appellant denied the accusation. Appellant later told Dinlocker, ". . . I said [to Alba] sorry I can't open that box because I don't know the combination, which is a lie, so finally I said no I know the combination" because an officer entered appellant's car and found a Wal-Mart receipt for the box. Appellant had gone to a person's home with a lock

box on two occasions, i.e., during the present incident, and during an incident involving a woman in Beverly Hills.[4]

Appellant presented no defense evidence.

3. *Subsequent Proceedings.*

Following Dinlocker's testimony, the court, on February 17, 2015, granted the People's motion to amend count 1 by interlineation to reflect appellant conspired to defraud another of property "of value exceeding $950." On February 18, 2015, the jury convicted appellant as previously indicated.[5] At the March 4, 2015 sentencing hearing, the prosecutor recommended that the court sentence appellant to the three-year upper term on count 1, plus "one-third the mid term as to count 2." Appellant's counsel asked the court to impose the middle term on count 1, and, as to count 2, "the presumptive mid term which would be an additional eight months."

The court sentenced appellant to county jail for the three-year upper term on count 1, with a consecutive subordinate term of eight months on count two. The court awarded appellant 54 days of presentence credit, ordered that he pay $7,000 in restitution, and imposed various fees and a fine. On April 22, 2015, appellant filed a notice of appeal.

---

[4] A CD recording of Dinlocker's interview of appellant and a transcript thereof (People's exhibit Nos. 3 and 4, respectively) were admitted into evidence at trial without objection.

[5] The probation report reflects appellant was born in 1957, and the report states appellant previously had suffered five felony convictions and eight misdemeanor convictions. The felony convictions included three convictions for petty theft with a prior (Pen. Code, § 666) and one burglary conviction (Pen. Code, § 459). The misdemeanor convictions included a conviction for petty theft (Pen. Code, § 488), three convictions for petty theft with a prior (Pen. Code, § 666), and two burglary convictions (Pen. Code, § 459).

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed November 5, 2015, the clerk of this court advised appellant to submit within 30 days any contentions, grounds of appeal, or arguments he wished this court to consider.

On December 7, 2015, appellant filed a supplemental letter brief. In it, appellant essentially protests his innocence. Appellant states, inter alia, that Alba and Dinlocker were liars and appellant purports to recount extensively what really happened.[6] He also argues the CD was "fake," "they dubbed [it]," and it did not reflect his repeated statements that he did not lie and would not lie because he is a licensed minister. Appellant further argues the trial court imposed the eight-month term on count 2 for Alba "[losing] a small amount of money" that appellant never received and concerning which appellant knew nothing.

Moreover, appellant argues in his brief that, during trial, his trial counsel asked him to write down the various lies that appellant claimed the witnesses were telling, appellant complied, but his trial counsel never questioned the witnesses about the lies; appellant's trial counsel "really worked for the D.A."; and appellant's trial counsel "did not really try to defend" appellant. Finally, appellant argues, (1) "[appellant's trial counsel], during the sentence ask[ed] the Judge to take that [eight-month term on count 2] off my charge, so the D.A. and the Judge both agreed," (*sic*) (2) the court awarded him 54 days of presentence credit, and (3) he was incarcerated since February 18, 2015,

---

**6** The recitation includes appellant's statement, "I was instructed by Mr. Anderson to say that I was a Merchant Banker from the Mega Millions Sweepstakes, was a code that I was the man to receive the donation for the gospel work" (*sic*) in Jamaica. Appellant thought he was receiving a donation from Alba until appellant heard Alba, speaking with Anderson on appellant's phone, ask Anderson where Alba's money was and whether appellant would give to Alba the check in the box after Alba gave the money to appellant. Appellant then confronted Anderson on the phone and told Anderson that he had lied to Alba and appellant.

8

therefore, he should be released in June 2016 instead of on November 26, 2016 (his release date as determined, he claims, by jail authorities).

However, at trial, appellant elected, as was his right, not to testify. As to his current protestations of innocence, including his assertion he knew nothing about Alba's loss supporting count 2, appellant's "assertions concerning facts that were not presented to the jury are not part of the appellate record and hence cannot be reviewed on the record before us." (*People v. Kelly* (2006) 40 Cal.4th 106, 126 (*Kelly*).) To the extent appellant's protestations of innocence amount to a challenge to the sufficiency of the evidence supporting his convictions, "[t]he evidence in the record is sufficient to support the jury's verdict[s]. [Citation.]" (*Ibid.*) To the extent appellant argues his trial counsel's alleged actions and/or omissions provided ineffective assistance of counsel, "this claim cannot be resolved on the present record. [Citation.]" (*Ibid.*)

Finally, to the extent appellant challenges imposition of the eight-month term on count 2 and claims he should be released in June 2016, the sentencing record belies appellant's assertion that his trial counsel asked the trial court not to impose the eight-month term, and belies appellant's assertion that the prosecutor and trial court agreed that that term would not be imposed. Moreover, appellant's total prison term of three years eight months commenced on March 4, 2015, the sentencing date, and not on February 18, 2015, the date of his convictions in this case. We have found no arguable issue. (*Kelly*, *supra*, 40 Cal.4th at p. 126.)

### *REVIEW ON APPEAL*

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*People v. Wende* (1979) 25 Cal.3d 436, 443; *Smith v. Robbins* (2000) 528 U.S. 259, 278-284.)

9

*DISPOSITION*

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


JONES, J.[*]



We concur:



EDMON, P. J.



ALDRICH, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.